WO

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Eric John Lanzeiri, Plaintiff | CV-02-1975-PHX-DGC (LOA) |
| v. | |
| Terry L. Stewart, et al., Defendant(s) | **ORDER** |

Under consideration is Defendants' Motion for Summary Judgment, filed February 22, 2005 (#68), supported by a separate Statement of Facts (#69) and Affidavit of Adu-Tutu (#71). Plaintiff has responded (#72) and filed his own Statement of Facts (#73). Defendants have filed a Reply (#74).

**1.    BACKGROUND**

Plaintiff, a prisoner of the Arizona Department of Corrections ("ADOC"), has filed a Second Amended Complaint (#39) asserting two counts: (1) deliberate indifference to serious dental needs and (2) denial of meaningful access to the courts. The Court's screening Order, filed June 10, 2004 (#38), dismissed a number of defendants. An answer to Count I (dental needs) was required from three dentists, Defendants Krebs, D'Mura, and Sears, and a dental assistant, Defendant Turnbow. An answer to Count II (access) was required from administrative Defendants Stewart and Bourgeous.

Plaintiff's deliberate indifference claim arises out of the dental care provided by ADOC over a period of several years. Plaintiff asserts that the care he received was so delayed and inadequate that he suffered the loss of nine teeth by extraction, with associated pain.

1 Plaintiff's access to the courts claim arises out of a Colorado state prosecution and a detainer placed against him by Colorado officials. Plaintiff asserts that Defendants failed to provide him with access to adequate Colorado state legal materials to allow him to challenge the detainer and be returned to Colorado for sentencing on his Colorado conviction.

In their motion for summary judgment, Defendants argue that Plaintiff was provided adequate dental care and cannot show deliberate indifference to serious dental needs. Defendants argue that Plaintiff's access claim is without merit because the detainer was eventually terminated. Moreover, because the detainer was terminated prior to the filing of Plaintiff's Second Amended Complaint, Defendants argue that Plaintiff has violated Rule 11 of the Federal Rules of Civil Procedure and should be sanctioned.

Plaintiff argues that continued delay in his dental treatment, in the face of ongoing decay, evidences deliberate indifference sufficient to sustain an Eighth Amendment violation. Although the detainer was terminated, Plaintiff argues that he was never able to seek sentencing from the Colorado courts and serve his sentence concurrently with his present incarceration.

**2.   STANDARD FOR SUMMARY JUDGMENT**

A court must grant summary judgment if the pleadings and supporting documents viewed in the light most favorable to the non-moving party "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

**3.   DELIBERATE INDIFFERENCE TO DENTAL NEEDS**

**A.   Material Undisputed Facts**

On July 23, 2001, Plaintiff reentered ADOC custody at the Alhambra Reception Center in Phoenix, Arizona. (DSOF ¶ 1, 6; PSOF ¶ 1.) Upon arrival, Plaintiff received a dental examination that included x-rays and instructions on oral hygiene. (DSOF ¶ 8.) Plaintiff informed the examiner that he recently had received two root canals and that he was "in the process of getting all my teeth filled and capped when I was arrested." (PSOF

¶ 2.)

On July 30, 2001, Plaintiff was transferred to the Stiner Unit of ASPC-Lewis in Buckeye, Arizona. (DSOF ¶ 11; PSOF ¶ 3.) On that same date, Plaintiff submitted a "Health Needs Request" ("HNR") complaining of tooth pain. (DSOF ¶ 12.) On August 6, 2001, Plaintiff was seen by Defendant Dr. D'Mura who examined, x-rayed, and treated Plaintiff with a temporary filling of tooth 7. (DSOF ¶ 13; PSOF ¶ 4.) Plaintiff was advised to put in another HNR for tooth 10, the next tooth requiring a filling. (PSOF ¶ 4.)

On August 13, 2001, Defendant Dr. D'Mura filled tooth 10 with a temporary filling. (PSOF ¶ 5.) Dr. D'Mura indicated tooth 29 was next for a filling, but told Plaintiff that the rest of his teeth were restorable. (PSOF ¶ 5.) On August 15, 2001, Plaintiff filed a HNR for dental care. (PSOF ¶ 6.) On August 20, 2001, Plaintiff was seen by Defendant Dr. Krebs, who diagnosed tooth 29 as having an irreversible inflammation of the pulp and recommended extraction. (DSOF ¶ 15.) Dr. Krebs also noted that the three teeth with prior root canals were decayed beyond "routine dental treatment" because of neglect. (DSOF ¶ 15.) Plaintiff asked for a root canal on tooth 29, but was told he did not meet the ADOC guidelines for a root canal. (PSOF ¶ 6.) Plaintiff refused extraction of tooth 29. (DSOF ¶ 15; PSOF ¶ 6.) Defendant dental assistant Turnbow told Plaintiff that even if he refused the extraction on August 20th, he was still not eligible for a filling or a root canal of tooth 29 at a later time. (PSOF ¶ 6.) When Defendant Dr. D'Mura entered the room, Plaintiff asked him to explain to Defendant Turnbow that tooth 29 could be saved. Defendant Dr. D'Mura refused to become engaged in the dispute over Plaintiff's treatment. (PSOF ¶ 6.)

Plaintiff was seen on August 23, 2001, and again refused extraction of tooth 29. (DSOF ¶ 16; PSOF ¶ 7.) Plaintiff requested fillings in other teeth, but was advised by Defendant Turnbow that he would not receive any further treatment until tooth 29 was extracted. (PSOF ¶ 7.) Plaintiff signed a "Refusal to Treat" form. (DSOF ¶ 16.)

Plaintiff was seen on September 4, 2001 and was scheduled for a filling in tooth 18. (DSOF ¶ 18; PSOF ¶ 8.) On September 20, 2001, Plaintiff was seen by Defendant Dr. Krebs,

1   complaining of pain and requesting extraction of tooth 18. Instead, Dr. Krebs provided
2   "conservative treatment – occlusion adjustment – to address teeth 18 and 19." (DSOF ¶
3   18; PSOF ¶ 9.) Dr. Krebs refused Plaintiff's request to have root canals in teeth 11, 13 and
4   19 filled and capped. (PSOF ¶ 9.) On September 27, 2001, Plaintiff returned requesting an
5   extraction of tooth 29.

6   On October 4, 2001, Dr. Krebs, after again informing Plaintiff that the tooth could not
7   be saved, extracted tooth 29. (DSOF ¶¶ 19-20; PSOF ¶ 10-11.) Plaintiff was treated by
8   Defendant Dr. Sears on October 11, 2001 for post-extraction pain. (DSOF ¶ 21.) Plaintiff
9   was told by Dr. Sears that he would need to submit another HNR for further fillings.
10  (PSOF ¶ 12.) On October 13, 2001, Plaintiff submitted a HNR requesting that some cavities
11  be filled. Plaintiff was told by Defendant Dr. Sears that he was on the "routine care list."
12  (DSOF ¶ 22; PSOF ¶ 13.) Plaintiff submitted two more HNRs in November 2001 requesting
13  fillings and was again told by Defendant Dr. Sears and Defendant Dr. Krebs that he was
14  on the "routine care list." (DSOF ¶ 23; PSOF ¶ 14 and 15 .)

15  From November 2001 until March 26, 2002, Plaintiff received no dental care. On
16  January 21, 2002, he wrote an "Inmate Letter" complaining of the failure to provide him with
17  fillings. (PSOF ¶ 16; PSOF Exhibit 12.) On March 4, 2002, Plaintiff submitted an Inmate
18  Grievance complaining of the failure to provide fillings. (PSOF ¶ 17; PSOF Exhibit 9.)

19  Plaintiff was seen on March 26, 2002, complaining of pain. According to Dr. Adu-
20  Tutu, the following transpired on that date:

21  > At the appointment, Lanzeiri told dental staff that he wanted the
    > routine treatment done. Dental Assistant Turnbow explained to
22  > Lanzeiri that he was on the list and that there were about 30 patients
    > in front of him, but if he had pain the doctor would examine him.
23  > Lanzeiri became upset, told the dental staff that he was going to sue
    > them and left the clinic. Dr. Sears was on duty, but because Lanzeiri
24  > left, he was not able to evaluate Lanzeiri's condition.

25  (Adu-Tutu Affid., #71 at ¶ 20.)

26  According to Plaintiff the explanation given was as follows:

27  > Dental informed Lanzeiri that they could do a pain evaluation but if
    > they did he would have to go to the bottom of the routine care list and
28  > wait 6 more months for a filling after he had already been on the

- 4 -

> routine care list for 6 months already. Louise Turnbow and Dr. Sears said I would have to live with the pain for a few more weeks and get a filling or go to the bottom of the routine care list.

(PSOF ¶ 19.) On April 8, 2002, Plaintiff filed an appeal on his grievance. (PSOF ¶ 19.)

During the following four months, beginning May 2, 2002, Dr. Sears replaced the temporary filling in tooth 7 with a permanent filling, treated tooth 21, prescribed pain medication, and scheduled an extraction of tooth 5. (DSOF ¶ 25, 26, 27 and 28; PSOF ¶ 20, 21.) Dr. Krebs extracted tooth 5 on June 6, 2002. (DSOF ¶ #29; PSOF ¶ 21.) Plaintiff submitted a HNR on June 24, 2002, complaining that a temporary filling had fallen out and required immediate care. (PSOF ¶ 24.)

Plaintiff submitted another HNR on June 28, 2002, complaining of severe pain in tooth 18, and was seen on July 2, 2002 by Dr. Krebs, who advised Plaintiff that he was not a candidate for a root canal in tooth 18 and recommended extraction. (PSOF ¶ 25.) Plaintiff declined extraction of tooth 18, stating that he did not want the pain and, in any event, wanted to wait until after weekend visits. (PSOF ¶ 25.)

Plaintiff returned on July 11, 2002, and Dr. Sears extracted tooth 18. Upon examination, Dr. Sears also noted that the root canals on teeth 11, 13, and 19 were deteriorating and might need extraction. (DSOF ¶ 31; PSOF ¶ 26.) On July 15, 2002, Plaintiff submitted a HNR requesting fillings on teeth 10, 12 and 20. (PSOF ¶ 27.) Dr. Sears followed up with him on July 15 and 23, 2002, for infection. (DSOF ¶ 32.) On August 6, 2002, Plaintiff was treated by Dr. Sears for pain in tooth 30. (DSOF ¶ 33; PSOF ¶ 28.)

Plaintiff subsequently submitted a HNR complaining of a broken tooth, and on August 19, 2002, Dr. Krebs extracted teeth 11 and 13. (DSOF ¶ 34; PSOF ¶ 29.)[1] Sutures were removed a week later. (DSOF ¶ 34.) On August 26, 2002, Plaintiff submitted a HNR requesting fillings in teeth 12 and 20, and replacement of the temporary filing in tooth 10.

---

[1] Plaintiff asserts that at the August 19, 2002 appointment, his request for something stronger than Ibuprofen for pain was denied. (PSOF ¶ 29.) This assertion is not supported by Plaintiff's affidavit or the attached records.

(PSOF ¶ 30.) Plaintiff was not seen in September, October, or November, 2002. He did, however, submit an inmate letter on September 30, 2002. (PSOF ¶ 31.) On October 7, 2002, Plaintiff initiated this lawsuit by filing his original Complaint (#1).

On November 18, 2002, Plaintiff submitted a HNR again complaining of his missing temporary filling. He was told he was on the scheduling list. (PSOF ¶ 32.) Plaintiff sought treatment for dental pain in tooth 12 on December 12, 2002, and was seen December 16, 2002. (DSOF ¶ 35; PSOF ¶ 33.) Plaintiff was told that if he received an evaluation and treatment on tooth 12 he would go to the bottom of the routine care schedule, thereby delaying treatment on tooth 10. (PSOF ¶ 33.) Accordingly, Plaintiff refused treatment. (DSOF ¶ 35, PSOF ¶ 33.) Plaintiff returned January 9, 2003 and Dr. Krebs restored the filling in tooth 10 that had now been missing nine months. (DSOF ¶ 36; PSOF ¶ 34.)

On January 11, 2003, Plaintiff submitted a HNR requesting treatment on tooth 12. (PSOF ¶ 35.) On January 21, 2003, Defendant Dr. D'Mura diagnosed Plaintiff with an infection in tooth 12 and prescribed a course of antibiotics. (DSOF ¶ 37; PSOF ¶ 35.) On January 28, 2003, Plaintiff submitted a HNR asking why his prescription had not been filled.[2] (PSOF ¶ 35.) On January 30, 2003, Plaintiff was seen by Dr. Krebs who determined that tooth 12 was not salvageable, and extracted it. (DSOF ¶ 38; PSOF ¶ 36.)

On February 10, 2003, Plaintiff was seen by Dr. Krebs, who extracted tooth 20 and recommended further treatment for tooth 19. (DSOF ¶ 39.) Plaintiff returned February 27, 2003 and Dr. Krebs extracted tooth 19. (DSOF ¶ 40.) Dr. Krebs subsequently treated Plaintiff for post-operative pain. (DSOF ¶ 41.) Plaintiff received a temporary filling in tooth 31 on April 2, 2003, and a permanent filling on June 26, 2003. (DSOF ¶ 42.)

From June 26, 2003 until June 2004, Plaintiff received no dental treatment. On June 23, 2004, Dr. Sears filled teeth 8 and 9. (DSOF ¶ 43.)

---

[2] The parties dispute whether Plaintiff failed to pickup his antibiotics prescribed on January 21, 2003 (DSOF ¶ 37; Adu-Tutu Affid., #71 at ¶ 34) or whether ADOC failed to make the prescription available (PSOF ¶ 35; PSOF Exhibit W). The Court does not find these disputed facts material to the resolution of the motion.

**b.     Discussion.**

Where the actions of prison administrators are alleged to have violated the Eighth Amendment, the Supreme Court has held that two requirements must be met. "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Second, "a prison official must have a 'sufficiently culpable state of mind.'" *Id.* (quoting *Wilson*, 501 U.S. at 297). "In prison-condition cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson*, 501 U.S. at 302-303). "It is well settled that deliberate indifference to serious medical needs of prisoners violates the Eighth Amendment." *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir. 1996). It is also settled that a dental problem can constitute a serious medical need. *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1989).

The law is equally clear in holding that mere negligence is not sufficient to establish a claim for deliberate indifference. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Even gross negligence is insufficient. *See Wood v. Housewright,* 900 F.2d 1332, 1334 (9th Cir. 1990). Only cruel and unusual *punishment* gives rise to liability, and Plaintiff therefore must show the requisite mental state of the defendants.

The Ninth Circuit recently summarized the law on the required subjective state of mind in a deliberate indifference case:

> A prison official acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." Under this standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." . . . This "subjective approach" focuses only "on what a defendant's mental attitude actually was."

*Toguchi v. Chung,* 391 F.3d 1051, 1057 (9th Cir. 2004) (citations omitted). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact

that the risk was obvious." *Farmer,* 511 U.S. at 842.

Defendants do not argue that Plaintiff's dental condition was not a serious medical need. The question that must be resolved in this motion, therefore, is whether Plaintiff has presented sufficient evidence that Defendants acted with deliberate indifference toward him, rather than merely being negligent or even grossly negligent. To defeat summary judgment, Plaintiff must produce evidence from which a reasonable jury could find that Defendants were deliberately indifferent to Plaintiff's serious dental needs.

Plaintiff admits that he reentered custody with severe pre-existing dental problems. (PSOF ¶ 2.) Plaintiff reported upon his arrival at the Alhambra facility that he had just received two root canals and was in the process of having "all of his teeth [either] filled or capped when he was arrested." *Id.* From July 2001 until June 2004, Defendants performed dental work on seventeen of Plaintiff's teeth, including nine fillings (teeth 7, 10, 18, 19, 21, 10, 31, 8 and 9) and eight extractions (teeth 29, 5, 18, 11, 13, 12, 20 and 19). Defendants treated Plaintiff some 30 times during this three-year period.

Plaintiff makes a variety of complaints about his dental treatment. Some of the complaints amount to disagreements over the proper treatment for his teeth. For example, Plaintiff disagreed with Dr. Krebs' conclusion that tooth 29 should be extracted and was not a candidate for a root canal, refusing to have the tooth extracted on August 20 and 23, 2001. (DSOF ¶ 15; PSOF ¶ 6-7.) Plaintiff disagreed with Dr. Krebs' conclusion on September 20, 2001 that tooth 18 should *not* be extracted, insisting that it should. (DSOF ¶ 18.) On at least five separate occasions, Plaintiff refused to accept the suggested dental treatment – August 20 and 23, 2001, and March 26, July 2, and December 16, 2002. Although Plaintiff's disagreements with Defendants may well have been genuine, a mere "difference of medical opinion . . . [is] not sufficient, as a matter of law, to establish deliberate indifference." *Toguchi*, 391 F.3d at 1058.

Plaintiff's primary complaint is that Defendants delayed his dental treatment. The Ninth Circuit has held, however, that a "[m]ere delay of [treatment], without more, is insufficient to state a claim of deliberate medical indifference." *Shapely v. Nev. Bd. of State*

*Prisons Com'rs,* 766 F.2d 404, 407 (9th Cir. 1985). Plaintiff must assert facts showing that the delay caused significant harm. *Id*. As noted above, Plaintiff must also show that the delay resulted from Defendants' deliberate indifference.

Plaintiff's recitation of events in this case, without more, does not constitute sufficient evidence that delays in his treatment resulted from deliberate indifference on the part of Defendants. Procedures of the Arizona Department of Corrections state that routine dental care will be provided on a first-come, first-serve basis, according to a scheduling list. The record reflects a practice of limiting emergency treatment to emergency cases, with inmates who receive such expedited treatment then dropping to the bottom of the routine care waiting list. Defendant Dr. Sears explained the process:

> If you have no severe pain (or emergency) you can wait for your filling appointment or if it is really bad you will be brought back for an extraction. Usually an emergency/abscess visit results in an extraction and rarely can a tooth that hurts really bad accept a filling and not give you excruciating pain until it is pulled. We can not do much about the length of the list, but we can give you the appropriate treatment when you get here.

(PSOF Exh. X7-X8, Response to grievance.)

The record in this case reflects that Plaintiff was seen promptly whenever he requested emergency care. The record also reflects that Defendants would suggest Plaintiff submit another HNR when his teeth were in need of additional work. Although it is true that Plaintiff experienced delays, sometimes substantial, while awaiting routine care, Plaintiff has presented no evidence that Defendants were acting other than according to ADOC policies and the established scheduling procedures, that they singled Plaintiff out for delay, that they denied him treatment when they were available to provide it, or that they otherwise acted with the necessary mental state of deliberate indifference.

Plaintiff would have the Court conclude that the delays necessitated by the ADOC schedule evince deliberate indifference on the part of Defendants, but the Court cannot do so. With a large and growing prison population, Defendants necessarily must schedule dental care and other services, providing emergency care before routine care and providing routine care on a scheduled basis. Plaintiff essentially argues for a different policy –

providing routine care on the basis of greatest need rather than on the basis of when the care is sought. In addition to the fact that Plaintiff presents no evidence that he would have received more prompt care under such a policy (that his dental needs were greater than those of other inmates), a disagreement with the wisdom or compassion of Defendants' scheduling policy does not establish that Defendants acted with deliberate indifference. Even if a jury could conclude that Defendants' scheduling of Plaintiff's care was negligent, or grossly negligent, Plaintiff would not establish the required mental intent.

The question is what Defendants actually thought. *Toguchi*, 391 F.3d at 1057. Plaintiff has not presented sufficient evidence that delays in his treatment resulted from deliberate indifference – intentional disregard – of his condition. To the contrary, the evidence suggests that Defendants were responsive every time Plaintiff presented with an emergency, advised him when he should seek additional treatment, administered routine care according to an established, prison-wide schedule, and succeeded in treating Plaintiff some 30 times in three years.

Plaintiff's recitation of events also fails to provide sufficient evidence that delays in his treatment caused the extraction of his teeth. As noted above, mere delay is not sufficient; Plaintiff must assert facts showing that the delay caused significant harm. *Shapely,* 766 F.2d at 407. Indeed, the First, Third, Sixth, and Eleventh Circuits require that "an inmate who complains that [a] delay in medical treatment rose to a constitutional violation, must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier v. Madison County, Ky*, 238 F.3d 739, 742 (6th Cir. 2001) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1188 (11th Cir. 1994)).

Plaintiff suffered from major dental problems when he came into Defendants' custody and care. He admitts that upon arrival "all" of his teeth were in need of root canals, fillings, and caps. (PSOF ¶ 2.) Defendants treated Plaintiff's emergencies promptly and provided routine care to the teeth in greatest need, suggesting Plaintiff submit

additional HNRs when more care was needed. Some of Defendants' efforts to save Plaintiff's teeth, such as tooth 18, were unsuccessful, and the root canals Plaintiff received before entering custody also appear ultimately to have failed.

Given the pre-existing condition of Plaintiff's teeth and the substantial dental care he did receive from Defendants, a jury could not reasonably conclude from the fact of delay alone that Plaintiff's loss of teeth could have been avoided – that more prompt treatment by Defendants would have saved his already-deteriorating teeth. Plaintiff has provided nothing beyond the fact of delay to support his claim. The Court concludes that Plaintiff has not presented sufficient evidence of causation to overcome summary judgment.

Because Plaintiff has failed to meet his burden of showing deliberate indifference on the part of Defendants and causation for the loss of his teeth, the Court will grant summary judgment on his dental care claim. Plaintiff cannot sustain his charge that Defendants' dental care constituted cruel and unusual punishment in violation of the Eighth Amendment.

    **c.**    **DENIAL OF ACCESS TO COURTS**

        **a.**    **Material Undisputed Facts**

On November 13, 2001, the Sheriff's Office of Weld County, Colorado, notified the Arizona Department of Corrections of an active warrant against Plaintiff and requested a detainer. (PSOF ¶ 39.) The warrant stemmed from Plaintiff's failure to appear for sentencing in a criminal trial in which he had already been convicted for escape. (PSOF Exh. 001.) Plaintiff received notice of the detainer from a Colorado public defender's office. (PSOF ¶ 40.) The public defender advised Plaintiff regarding the steps that were required for him to act on the detainer and to be returned to Colorado for sentencing, including the requirement that Plaintiff be advised by ADOC of the detainer and request a "final disposition." (PSOF ¶ 40.)

Plaintiff never received notice from ADOC about the detainer. (PSOF ¶ 40 (second).) On December 26, 2001, Plaintiff wrote the public defender advising him of that fact. (PSOF

1  ¶ 41.) On January 10, 2002, the public defender advised Plaintiff to request final
2  disposition anyway. (PSOF ¶ 42.) On January 15, 2002, Plaintiff filed an inmate letter with
3  ADOC requesting final disposition of the detainer, but never received a response. (PSOF
4  ¶ 43.)

5  On February 25, 2002, Plaintiff received a letter from the public defender's office
6  advising him that the court could impose sentence on the Colorado conviction to run
7  concurrently with his Arizona sentence, but that the prosecutor would not consent to
8  sentencing Petitioner *in absentia*. (PSOF ¶ 44.) Indeed, the letter opined that there was
9  "probably a good chance" that Plaintiff would obtain a concurrent sentence, but noted that
10 the prosecutor would not enter into such a stipulation. (PSOF Exhibit EE.) The letter also
11 noted that the public defender had not received notice of Plaintiff's request for final
12 disposition of the detainer, and advised Plaintiff to file a petition for writ of habeas corpus.
13 (PSOF ¶ 44.)

14 Plaintiff sought forms or copies of the law from the ADOC library to file a petition
15 for writ of habeas corpus with the Colorado courts, but was refused. (PSOF ¶ 45.) The
16 policies of ADOC preclude employees from supplying inmates with out-of-state court
17 forms and direct inmates to obtain them directly from the relevant state. (DSOF ¶ 46.)
18 Plaintiff proceeded to prepare a habeas petition with the help of an inmate and filed it in
19 Colorado on March 15, 2002. (PSOF ¶ 45.)

20 On July 15, 2002, the public defender wrote Plaintiff and advised him that Colorado
21 would bring Plaintiff back for sentencing if he would file for final disposition of the
22 detainer; otherwise, Colorado would wait until he completed his Arizona sentence. (PSOF
23 ¶ 46.) The letter also advised Plaintiff that the Colorado prosecutor was of the opinion
24 that the Interstate Agreement on Detainers did not apply. (PSOF Exhibit FF.) Plaintiff
25 responded by informing the public defender that he had instead filed the habeas petition
26 and asked the public defender to check on its status. (PSOF ¶ 47.)

27 On August 20, 2002, Plaintiff began the process of grieving his denial of access to
28 the courts, but failed to appeal all the way to the Director of ADOC. (PSOF ¶ 48.) As a

1  result of Plaintiff's failure to completely exhaust the claim, his lawsuit on the issue was
2  dismissed. Accordingly, on April 24, 2003, Plaintiff began the process of grieving the issue
3  again. (PSOF ¶ 49.)

4  In addition, on May 28, 2003, Plaintiff wrote the Colorado court offering to waive
5  extradition if the Court would agree to certain sentencing conditions. (PSOF ¶ 50; PSOF
6  Exh. LL.) On June 10, 2003, the Colorado court ordered the prosecution to show cause why
7  the relief should not be granted. (PSOF ¶ 51.) The prosecution responded by noting
8  Plaintiff's repeated requests for sentencing, but noted that the situation was not covered
9  by the Interstate Agreement on Detainers and that sentencing therefore should be delayed
10 until completion of Plaintiff's Arizona sentence. (PSOF ¶ 52.)

11 On January 12, 2004, Plaintiff's Colorado habeas petition, filed in March, 2002, was
12 deemed to be deficient on its face. (PSOF ¶ 45.) The Colorado court, however, addressed
13 the merits of the petition and concluded that it should be denied because the Interstate
14 Agreement on Detainers and the Uniform Mandatory Disposition of Detainers Act did not
15 apply because Plaintiff was not awaiting trial in Colorado, but was awaiting sentencing.
16 (PSOF Exhibit OO.)

17 On January 19, 2004, the Sheriff's Office of Weld County, Colorado cancelled the
18 detainer against Plaintiff, but requested notice of his impending release so they could act
19 on their still-pending warrant. (DSOF ¶ 44; PSOF ¶ 55.)

20      **b.**    **Discussion**.

21 To establish a violation of the right of access to the courts, a prisoner must
22 establish that he or she suffered an actual injury, i.e. "actual prejudice with respect to
23 contemplated or existing litigation, such as the inability to meet a filing deadline or to
24 present a claim." *Lewis v. Casey,* 518 U.S. 343, 348 (1996). Plaintiff argues he was injured
25 because ADOC failed to afford him sufficient access to the courts to allow him to be
26 returned to Colorado for sentencing. Plaintiff assumes that if he had been returned to
27 Colorado and sentenced, he would have received a sentence concurrent with his Arizona
28 sentence. This assumption is based solely on the representation of his Colorado public

defender that there was a "good chance" for such a sentence. Plaintiff has provided no other evidence from which to determine how the Colorado court would have sentenced Plaintiff. His injury is at best speculative.

More particularly, Plaintiff's claim is that ADOC caused this injury by failing to provide him with Interstate Agreement on Detainers ("IAD") forms, and forms and law necessary to prepare a proper Colorado habeas petition to secure his immediate sentencing.[3] Assuming that Defendants had a duty to make available to Plaintiff the forms and law of Colorado, Plaintiff has failed to establish that their failure to do so actually injured Plaintiff. Although the Colorado court concluded that Plaintiff's habeas petition was deficient on its face, the court proceeded to consider it on the merits. Plaintiff's petition was denied because Plaintiff was not facing outstanding charges, but was waiting to be sentenced on completed convictions. The IAD therefore did not apply and Plaintiff had no right to be returned to Colorado.[4]

Plaintiff argues that the deficiencies nonetheless injured Plaintiff because, but for the deficiencies, the habeas petition would have been heard in March 2002 rather than January 2004. But Plaintiff offers nothing to show that the outcome in 2002 would have been favorable. Plaintiff may be asking this Court to conclude that in 2002 the prosecutor was more amenable to immediate sentencing of Plaintiff and that the court would have been swayed by the prosecutor to ignore the longstanding law of Colorado excluding Plaintiff

---

[3] Plaintiff also makes reference to the Uniform Mandatory Disposition of Detainers Act. The statute, however, governs only intrastate detainers. Plaintiff was seeking an *interstate* transfer from Arizona to Colorado, and thus the statute had no application.

[4] Although the correctness of the Colorado decision is not entirely clear, *compare Tinghitella v. State of Cal.*, 718 F.2d 308, 311 (9th Cir. 1983) ("we conclude that the terms 'trial' and 'final disposition' as used in the IAD encompass sentencing") with *U.S. v. Hoffman*, 905 F.2d 330, 333 (10th Cir. 1990) ("[w]e hold that 'trial' in the IAD anti-shuttling provisions does not include sentencing), it was rendered by the court that would have ruled on Plaintiff's request even if in a different form. There is no reason to think that any action by Defendants would have produced a different ruling.

from the protections of the IAD.[5] But this suggestion is also speculative.

Plaintiff has not met his burden of establishing the elements essential to his access to the courts claim. *Celotex*, 477 U.S. at 322-323. Defendants have established that they are entitled to judgment as a matter of law.[6]

**IT IS ORDERED:**

1. Defendants' Motion for Summary Judgment (#68) is **GRANTED**.

2. The Clerk shall terminate this action.

DATED this 30th day of September, 2005.

David G. Campbell
United States District Judge

---

[5] The Colorado court relied upon a 1993 case, *Moody v. Corsentino*, 843 P.2d 1355 (Colo.1993), to reject Plaintiff's IAD claim.

[6] Defendants argue that Plaintiff's claim is frivolous because is was rendered moot when the Colorado detainer was cancelled. Defendants misconstrue Plaintiff's complaint. Plaintiff does not seek damages based on the existence of the detainer, but based upon ADOC's failure to assist Plaintiff in acting on the detainer. The Court concludes that Plaintiff's claim was not baseless at the time of his amended complaint, and the request for Rule 11 sanctions will therefore be denied.